### THE FEARLESS.*

### SHIPOWNERS' & MERCHANTS' TUGBOAT CO. v. A. H. BULL & CO., Inc.

(Circuit Court of Appeals, Ninth Circuit. February 3, 1919.)

#### No. 3199.

Towage ⊜⊐11(7)—Assisting Moving Steamship—Negligence.

A tug, employed to assist a steamship in moving to dry dock, which, without speaking to her captain, towed her stern first from her slip and dropped the towline, which fouled her propeller, *held* in fault for her injury by being driven by wind and tide against a pier.

Appeal from the District Court of the United States for the First Division of the Northern District of California; Maurice T. Dooling, Judge.

Suit in admiralty by A. H. Bull & Co., Incorporated, against the tug Fearless; the Shipowners' & Merchants' Tugboat Company, claimant. Decree for libelant, and claimant appeals. Affirmed.

William Denman and McCutchen, Olney & Willard, all of San Francisco, Cal., for appellant.

E. S. Pillsbury, F. D. Madison, Alfred Sutro, and Oscar Sutro, all of San Francisco, Cal., for appellee.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

ROSS, Circuit Judge. We think this a plain case, and that it was rightly decided by the learned judge of the court below. It grew out of damage to the appellee's steamship Edith, caused by its collision with Pier 32 in the harbor of San Francisco, by reason of the alleged negligent management and maneuvering of the tug Fearless, which the ship had employed to assist it in moving from its then position in the slip between Piers 44 and 46 to the dry dock at Hunter's Point. The

⊜⊐For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Rehearing denied May 12, 1919.

piers there are numbered consecutively to the northerly from Pier 46, as 44, 42, 40, 38, 36, 34, and 32, and the maneuvers involved in the case were confined to the waters of the bay off Piers 46 to 32. Pier 46 extends into the bay about 800 feet from the water-front line; 44, 42, and 40 extend 650 feet from the water-front line; 38, 667 feet; 36, 721 feet; 34, 662 feet; and 32, 805 feet. On account of the bend in the shore, pier head 32 extends to the easterly over 300 feet beyond pier heads 44, 42, 40, and 38, while it extends over 200 feet beyond pier head 34. At the time in question a southeasterly wind of about 18 miles was blowing, and an ebb tide was then flowing in direction from Pier 46 to Pier 32, and, on account of the narrowing of the bay at that point, on towards the shore line.

The Edith was lying in the slip between Piers 46 and 44, with her bow to the shore and with her stern consequently pointing off shore. The tug was, as has been said, engaged to assist the ship in her movement from her place in the slip to the dry dock; the ship being under her own steam, and her master intending to back his ship out of the slip, and, with the assistance of the tug, to turn her bow into the wind and tide, and thus proceed in a southeasterly direction to the dry dock at Hunter's Point.

The evidence is without conflict to the effect that, although the tug was engaged to assist the ship in that maneuver, the captain of the tug proceeded with its undertaking without the slightest effort to ascertain from the master of the ship what his plans were with respect to the maneuver. We extract from the testimony of the captain of the tug, as follows:

"Q. What instructions did you get from the captain of the Edith? A. I didn't get any instructions from the captain of the Edith, except to go ahead. Q. Did you consult with him before you went out of the slip? A. No. Q. Did you have a talk with anybody at the office (of the tugboat company) as to what should be done? A. Capt. Randall at the office told me what to do. Q. What did he tell you to do? A. He told me to go up there and assist the ship to dry dock. Q. Did he say anything else? A. Nothing else. Q. When you got up to the Edith, did you have any consultation with the captain? A. No. Q. You waited until he got ready— A. (interrupting). Waited until he got ready and told me to go ahead. Q. Did you consider this a towage contract, or what you call an assist? A. They call it an assist. Q. In an assist, you take the orders of the master of the vessel? A. Take the orders from the master. Q. You make the lines fast that he tells you? A. We generally arrange it, making fast the line ourselves. Q. You do not wait for his orders about that? A. When I had enough, I told him to make fast. Q. Did you drop the line when he told you to? A. In this particular case he did not tell me to. Q. Now, I am talking about an assist. As I understand it, there are two kinds of towage arrangements; one is where you have a straight tow, a towage contract, a towage duty, and the other where you have what they call an assist. Isn't that correct? A. Correct. Q. You distinguish between those two cases? A. Yes; I do. Q. And they are generally distinguished, aren't they? They are generally recognized as two kinds of service? A. Yes. Q. One is called towage, and the other is called an assist? A. An assist; that is also a tow, to assist. Q. As a matter of fact, is there any difference between the two kinds of service? A. Well, there is. Q. In one case you take your orders—in one case you are in charge and the other you are not? A. Correct. Q. Is that the difference? A. That is the difference. Q. Now, in those cases in which you are in charge, the thing is done the way you direct? A. Yes. Q. And in those cases in which you are not in charge you get orders as to how it should be done. Is that correct? A. Yes. Q. Is that

correct? A. Correct. Q. So that, in the case of an assist, you would be getting the orders of the captain, would you? A. I would be getting the orders from the captain; yes."

The Edith was about 328 feet long and of about 2,700 tons register, and drew about 10 feet aft and 6 feet forward. The towline used by the tug in assisting the ship in backing from the dock was about 30 fathoms in length, and at the end of it attached to the ship her master stationed his second mate for the purpose, according to his deposition, of by that means communicating with the tug, concerning which, however, the mate in the course of his deposition testified as follows:

"Q. You said you expected the tug to get orders from the master? A. Yes. Q. How were you expecting the master of your ship—he was on the bridge; isn't that right? A. Yes. Q. How did you expect the master on the bridge of your ship to give an order to the tug to go ahead? A. By the whistle. Q. What whistle would he make? A. That depends on which way they make it out between them. Q. What? A. They make that out between them, what kind of a whistle they are going to use. Q. They usually agree on what the signal shall be? A. Yes. * * * Q. Your duty on the stern is to keep an eye on the towing line? A. But we are not supposed to watch the tug, too; he is supposed to give us a signal what to do. Q. Who is? A. The tug captain. Q. What signal did you expect the tug to give? A. I expected the tug captain to blow a short blast, the same as the rest of them do. Q. Had you ever been towed by that tug before? A. No. Q. Did you ever have any conversation with her master before starting out as to what signals he would give you? A. No, sir."

The case shows that in that condition of affairs the maneuver in question commenced by the reverse movement of the engines of the ship, and by the pulling of the tug on the towline attached to the stern of the ship, by which the latter was carried out into the water of the bay, variously stated in the record at from 30 or 40 to about 700 feet from the slip. Whatever the real distance, from that point the ship's captain intended to swing her bow southeasterly and proceed to the dry dock, using the holding of the towline attached to the stern of the ship as a pivot. It appears, however, that the tug's captain, without direction from the master of the ship, and without giving him any notice whatever of his intention so to do, let go the towline, which soon got into the wheel, thus fouling the ship's propeller and making necessary the stopping of her engines. We think it does not admit of doubt that such action of the captain of the tug was a gross fault on its part and the real cause of the resultant damage.

It is suggested that the operation which the tug intended and attempted was to drop the stern towline of the Edith (which it did), then circle around to her starboard bow, and there take a bowline, and by means of that pull the ship's bow into the tide and wind. Indeed, the captain of the tug so testified in effect in answer to questions by the court, as is shown by this extract from his testimony:

"Q. Why did you cast off there 700 feet away from the wharf? A. Well, we cast off because I intended to come under the bow of the ship and get a bowline and pull her around. Q. Did you have room enough for that? A. I had room enough; if I had got the line, I would have had room enough. Q. You made no investigation or inquiry to find out whether there was a line you could get? A. I never went aboard the ship; I didn't know what they had there. Q. You undertook that maneuver without finding out what they

had aboard ship? A. I took the captain's word for that. Q. What did he tell you? A. He told me to pull the ship out of the wharf, from the wharf. Q. You didn't know what you were going to do, and you did not know what he was going to do? A. No."

Such a movement on the part of the tug was not only not directed by the master of the ship, but was directly contrary to the latter's own movement and plan, and was commenced without the slightest notice to. the ship of the tug's action. In our opinion it is impossible to hold it either authorized or justified.

We agree with the court below that it was to those faults the accident was due, and that the tug was guilty of further fault in failing to pass to the ship while she was drifting a line of sufficient strength to hold her, which the tug should have been prepared to do. Nor are we able to agree with the proctors for the appellant that the master of the ship should be held in fault in failing to drop her anchors, the condition of the wind and the water, and the location of the ship with respect to the various piers being duly considered.

The judgment is affirmed.